IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 18, 2002 Session

## STATE OF TENNESSEE v. WILLIAM E. EAKES, III

**Direct Appeal from the Criminal Court for Davidson County**
**No. 99-A-35     Seth Norman, Judge**

_____

**No. M2001-01420-CCA-R3-CD - Filed July 1, 2003**

_____

The Davidson County Grand Jury indicted the Defendant for one count of first degree felony murder and for one count of second degree murder. A Davidson County jury convicted the Defendant of both offenses. The trial court merged the second degree murder conviction into the felony murder conviction and sentenced the Defendant to life imprisonment. The Defendant now appeals, arguing that insufficient evidence was presented at trial to convict him of first degree felony murder and of second degree murder. Concluding that sufficient evidence was presented to convict the Defendant for felony murder and second degree murder, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

James O. Martin, III, Nashville, Tennessee (on appeal); and Rayburn McGowan, Nashville, Tennessee (at trial), for the appellant, William E. Eakes, III.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Lisa A. Naylor and Pamela Anderson, Assistant District Attorney Generals, for the appellee, State of Tennessee.

**OPINION**

I. FACTUAL BACKGROUND

The following evidence was presented at the Defendant's trial: Myra Christman, the victim's mother, testified that in May 1998, she was living in Antioch, Tennessee with the victim and with the victim's step-father, Thomas Ward. She stated that the victim was approximately five feet, eight inches in height; that he weighed approximately 140 to 142 pounds; and that he was right-handed. Christman testified that on the afternoon of May 22, 1998, she went to the credit union to withdraw

money from an account that she and the victim shared.  She stated that she gave the victim $175 when she got home around 4:00 p.m.

Christman testified that around 9:30 p.m., her sister, who was at Christman's home watching a basketball game on television, answered the telephone.  According to Christman, the phone call was from "a young man" who was calling for the victim.  Christman testified that the victim spoke to the person on the phone and then left home around 9:45 p.m.  She stated that when the victim departed, he was wearing a pair of blue jean shorts, Michael Jordan tennis shoes worth about $180, and a black and gray striped shirt.  She further stated that underneath his shirt, the victim was wearing a gray shirt.  Christman testified that the victim was wearing a gold necklace, a gold watch that cost about $380, a gold ring with diamonds in it that cost $528, and a diamond ring in his left ear.  Christman noted that the Defendant always carried his wallet with him and that his driver's license was in his wallet.

Christman testified that when the victim left home, his clothes did not have any bleach stains on them, and the victim did not have any noticeable injuries on his body.  She reported that the victim left in a 1992 Nissan Sentra that was titled in her name.  Christman stated that the car was white with black channels on the side.  She noted that when the victim left, the rearview window on the car was not broken.

Christman recalled that when her son did not come home that night, she tried to contact him on his pager.  She stated that normally when she paged her son, he returned the call immediately.  Christman testified that when the victim was found, he did not have his ring, his watch, his diamond earring, his wallet with his driver's license, his shoes, or the $175 cash that was on his person when he left home.

On cross-examination, Christman testified that the victim did not pay rent to live in her house, but she stated that he gave her money to pay for the telephone bill.  She stated that the victim wore designer clothes that he bought himself.  Christman acknowledged that the victim had not had a job since July 1997.  She testified that the victim was able to buy the clothes because he had saved money.  She stated that the victim had worked since he was in the eleventh grade and that he had saved all of his money.  Christman testified that the victim had been planning to go to college, so she had set up a fund for him when he was "little."

Christman testified that the victim owned a car and that he paid for his own gas.  She maintained she did not know that the victim used drugs.  Christman acknowledged that although she was worried about the victim, she did not call the police when he did not return home.  She stated that the police came to her home on the Sunday following the victim's Friday disappearance.  Christman recalled answering questions under oath on August 23, 1999, and she acknowledged that she failed to itemize any items that were taken from the victim.

On re-direct examination, Christman testified that the victim had received a settlement in 1997 resulting from a car accident in which the victim's neck and back were injured.  On re-cross

examination, she acknowledged that the only withdrawal made from the victim's account during April and May of that year was for $300.

Thomas Ward, the victim's stepfather, stated that he had lived with the victim and the victim's mother for twenty-two or twenty-three years. He stated that on May 22, 1998, he was at home with Myra Christman, Christman's sister, one of his friends, and the victim. Ward recalled that the victim was in his room at some point watching television. He testified that the victim left the home on Friday evening and never returned.

On cross-examination, Ward testified that he thought the victim left around 8:00 or 9:00 p.m. on that night. He recalled that the victim was wearing blue shorts and a light-colored, striped shirt when he left. Ward stated that the victim "pretty much wore jewelry all the time," but he could not specifically remember if the victim was wearing jewelry on the night that he left.

Tracy Rosser testified that in May 1998, she was working as the general manager at a Motel 6 located at 95 Wallace Road in Davidson County. She stated that the hotel had about fourteen employees and 125 rooms. Rosser recalled that on the evening of Friday, May 22, 1998, she returned from dinner around 10:30 p.m.. She testified that while she was at the front desk, she noticed a frequent guest who was requesting an additional key to her room. Rosser stated that she decided to let the guest into her room with the pass key rather than issuing an additional key. According to Rosser, as she walked the guest to room 144, she passed room 143 and noticed that the curtains were ripped down off the drapery hooks.

Rosser testified that she observed a light on in room 143, so she knocked on the door. She stated that the occupants of the room did not open the door, so she knocked again and told them that she was the manager. Rosser testified that when the occupants still did not open the door, she told them, "If you don't open the door, I'm going to call the police." She reported that a man finally "came to the door, opened it, not very much, enough to just stick his head out the door." Rosser testified that the man said his name was Jerry and told her that he knew her. She stated that she told the man that she was the manager and that she did not know him. Rosser testified that when she asked the man about the curtains, he told her, "Oh, we were just having rough sex." She reported that she told the man that the hotel did not allow parties and that he replied, "Well, we just had a little fight but everything is okay now." Rosser testified that she told the man that if there were any disturbances from that room, she would have to ask them to leave, and he said, "Everything is fine."

Rosser testified that although the light was on in the room when she knocked on the door, that it was dark inside when the man opened the door. She stated that she would not have knocked on the door if the light had been turned off. Rosser recalled that the man who came to the door was wearing pants but not a shirt. She also recalled that the man "was a little sweaty." Rosser testified that she did not see anyone else in the room. She stated that at some point, the man raised his left hand to adjust the shades, but he kept his right hand behind the door. Rosser testified that she was unable to see into the room.

Rosser stated that after she left room 143, she notified the front desk that if there were any disturbances caused by any of the rooms, she was to be notified. She stated that around 2:30 a.m., she was notified that guests had tapped on the night bell to request another key. Rosser instructed the front desk to check each guest's identification and issue a key only if he or she was a registered guest. She testified that after the initial disturbance, she verified that room 143 was registered to Jerry Barnes. According to the registration slip, only one person was registered to stay in the room on that night. She testified that the $31.99 plus tax was paid for the room in cash at check-in. Rosser stated that proof of identification is required by the hotel prior to check-in.

Rosser testified that she had inspected room 143 earlier that day, and the curtains were properly hung. She stated that all of the rooms had recently been renovated and that they all had new curtains, bedspreads, and carpets. Rosser identified a photograph of the bedspread from room 143. She testified that each room was equipped with a bedspread, a set of sheets, a blanket, a mattress pad, and two pillows for each bed in the room.

Rosser recalled that around noon on Saturday, May 23, 1998, a housekeeper named George came into her office and "said that all of the bedding was missing out of one of the rooms and he saw some blood on the wall and that [Rosser] might need to come look at it." She stated that she went directly to room 143, where she observed blood on the wall, on the carpet, and on the phone. Rosser reported that the bedding was missing and that there were "a lot of empty beer bottles and a lot of cigarette butts . . . laying everywhere." Rosser stated that she locked the door and called the police. She testified that Jerry Barnes did not return the key to room 143.

On cross-examination, Rosser identified the man who answered the door of room 143 on the evening of May 22, 1998 as Jerry Barnes. She stated that she did not receive any complaints regarding room 143. Rosser recalled that three or four hooks on the drapes in room 143 were "off." She stated that she knocked on the door to room 143 because she thought there might have been a party inside.

Detective Johnny Lawrence testified that he had been employed by the Nashville Metropolitan Police Department since November 1981 and that in May 1998, he was working in the Homicide Unit. He recalled that on May 23, 1998, he was dispatched to room 143 of the Motel 6 near I-24 and Harding Place. He reported that when he arrived on the scene at approximately 1:50 p.m., Officer Campbell had already secured the room and obtained some information from employees. Lawrence observed blood splattered on the wall, on the telephone, and on the table. He stated that there was a large amount of blood on the floor that had soaked into the carpet. He also stated that there were no linens on the beds. Lawrence testified that the only area that really seemed to be disturbed was the area between the bed and the window. He noted that it was "weird" that there were "all these cigarette butts on top of the carpet and none of them [had] blood on them, which would indicate that the cigarettes came after the blood." He explained, "Otherwise, the blood would be on top of the cigarettes."

-4-

Lawrence testified that by the time he arrived at the scene, Officer Campbell had obtained the name and address of a suspect, as well as the license plate number of the suspect's truck. According to Lawrence, the suspect's name was Jerry Barnes, and he resided at 212 Old Tusculum Road. He stated that the license plate of the truck was registered to a company. Lawrence testified that when he arrived at Barnes's home, he saw a green truck with a Tennessee Titans decal on the door. He reported that the license plate number on the truck matched that listed on the registration from the Motel 6. Upon closer examination, Lawrence observed dried blood on the outside of the driver's door, on the seat, and on the emergency flasher button. He stated that he secured the vehicle and then went to the door of the home.

Lawrence stated that a woman who identified herself as Jerry Barnes's wife came to the door. He stated that Barnes's wife told him that Barnes had just gone to the store to buy some beer. Lawrence testified that he had received information at the hotel about the Defendant, and he asked Barnes's wife if she had seen him. He stated that Barnes's wife told him that the Defendant was with Barnes. Lawrence testified that Barnes's wife led him to a washing machine and pulled some laundry out of the machine that had been freshly washed and that was still damp. According to Lawrence, the clothing included a pair of sweat pants and a black tee shirt with a ball team logo on the front of it. He stated that the clothes were heavily stained with what appeared to be blood.

Lawrence testified that the truck was photographed at the scene and that it was then taken to the crime laboratory to be processed. He stated that the truck belonged to Tennessee Valley Exterminating. Lawrence believed that Officer Shea processed the vehicle on May 29, 1998. Lawrence testified that he returned to the hotel and then went back to the Barnes residence around 5:00 p.m., but nobody answered the door. He stated that he later went to the Defendant's home at 3429 Keeley Drive. Lawrence testified that prior to going to the Defendant's home, he had placed a BOLO ("be on the look out") for Jerry Barnes and the Defendant, along with a description of a blue Corsica owned by Barnes.

Lawrence reported that he had received information that Barnes often rented hotel rooms in the area, so he had officers check every hotel near the Motel 6. He stated that on May 24, 1998, an officer located Barnes's vehicle at a Super 8 Motel on Harding Place. Lawrence testified that the front desk confirmed that the Defendant had rented room 349 of that hotel. He recalled that just as officers were about to approach the room, Barnes and the Defendant walked outside. Lawrence stated that Barnes "started talking to [him] just the minute he saw [him]," but the Defendant did not say anything. According to Lawrence, Barnes told him that he could take the officers to the victim. He testified that Barnes led police to a salvage yard off of Almaville Road in Rutherford County.

Lawrence testified that Barnes led police to a Nissan Sentra that was located "quite some distance off the road," and he stated that there was "no way the car could have been found if [Barnes] hadn't shown [police] where it was at." Lawrence testified that the vehicle was "way off in the woods, down a little embankment, wedged between two trees." Lawrence observed "a lot of blood coming out of the wheel well on the left side." He stated that blood appeared to be coming from the trunk area. Lawrence testified that a deceased victim was found inside the trunk.

On cross-examination, Lawrence acknowledged that some of the furniture in the Motel 6 room had been moved to process the crime scene. He stated that he was not aware that any of the blood had been tested. Lawrence testified that a piece of some form of jewelry, specifically a "chain of some type," was found at the end of the bed. Lawrence opined that it could be part of a bracelet or a necklace. He stated that when he first saw Barnes at the Super 8 Motel, Barnes was very apologetic. Lawrence reported that a piece of steel wool that could have been used as drug paraphernalia was found. He recalled that the license plate was missing from the victim's Nissan Sentra when it was located by police. Lawrence observed a contusion on Barnes's left thumb. He could not specifically remember the victim's family mentioning any jewelry that belonged to the victim.

On redirect examination, Lawrence testified that the Defendant was not taken to the hospital for any injuries. On re-cross examination, he stated that evidence was obtained from at least five different locations in south Nashville.

Edward Michael Shea testified that he is a crime scene investigator with the Metropolitan Police Department. He stated that he examined a 1996 Isuzu two-door truck in connection with this case. Shea observed a blood stain in the front seat of the truck near the gear shift and a small amount of blood around the door panel area. He stated that both samples tested positive as being blood. On cross-examination, Shea reported that he did not lift any fingerprints from the vehicle. He stated that he did not do any tests to determine whose blood was in the truck.

Steve Stone of the Metropolitan Police Department Crime Scene Unit testified that he went to Jerry Barnes's home, where he was given some items of clothing from Detective Lawrence. He also testified that he photographed blood stains on the door of Barnes's truck. Stone reported that he examined room 143 at the Motel 6 and collected the following items: a blood-stained white mattress pad, a sample of the carpet that appeared to have a blood stain on it, a couple of pieces of jewelry that appeared to be parts of a necklace or a bracelet, a sample of the mattress that appeared to have a blood stain on it, the coiled cord from the telephone in the room which appeared to be stained with blood, and numerous Marlboro Light cigarette butts. Stone testified that in addition to the items he collected, he also dusted several items in the room for fingerprints, including a light switch plate, the area around the television, the television remote control, the telephone, and beer cans and bottles that were in the trash and on the floor.

On cross-examination, Stone stated that he went to Barnes's home before going to the Motel 6. He testified that he was the only officer in charge of processing the hotel room. Stone noted that it was apparent that there had been a struggle in the room. He maintained that he did not see a piece of jewelry in the room.

Wayne Hughes testified that he is an officer with the Identification Division of the Metropolitan Police Department. He stated that on Sunday, May 24, 1998, he responded to a call at the Super 8 Motel at 350 Harding Place. Hughes reported that he met with Officer Mark Nelson and photographed a blue Corsica located at the motel. He testified that he then met Detective Johnny

Lawrence on Hill Road in Rutherford County, where the police found the victim's white Nissan Sentra parked in a field "quite a distance off the road." He stated that he photographed the vehicle and collected a Budweiser beer bottle that was nearby. Hughes testified that he gave the bottle to Officer Blackwood for testing.

Officer Robert Collins testified that he is a member of the K-9 Section of the Metropolitan Police Department. He stated that on or about May 24, 1998, he was requested to do an "article search" at the Hillcrest United Methodist Church at 5112 Raywood Lane in South Nashville. He reported that with the assistance of a canine, he looked for, and found, an ax. On cross-examination, Collins testified that the ax was located in a wooded area amongst some weeds.

Tim Matthews testified that he works in the Identification Section of the Metropolitan Police Department as a crime scene investigator. He stated that on May 24, 1998, he was dispatched to Fairlane Square on Nolensville Road to recover some evidence found in a dumpster behind a shopping center. Matthews reported that the evidence included several cloth items that appeared to have blood on them. He testified that he recovered a white plastic bag which contained a gray tee-shirt with a UT 1997 "SEC Champions" logo on it, one white pillowcase, one white bed sheet, one pair of Britannica blue jeans, one pair of H.I.S. blue jeans, and one white washcloth. He stated that in a pocket of the H.I.S. jeans, he found three paper hand towels, one "six-pack holder like a can holder and plastic," and one faucet screen that would screw into a faucet.

Matthews testified that he also investigated another dumpster located on a street near the first dumpster. He stated that he recovered two white plastic garbage bags from it which contained the following items: one pillow that was white with blue stripes, one blue blanket, and one multi-colored bedspread that was soaked in blood. Finally, Matthews testified that he went to an area behind Hillcrest Methodist Church, located at 5112 Raywood Lane. He stated that he photographed the area and an ax that had been located by the canine unit. Matthews reported that the ax had "Scout Felling Ax" written on it. He then sent the ax to be tested.

On cross-examination, Matthews recalled that Detective Tim Mason was present when he arrived at the first dumpster. He acknowledged that he could not identify who had worn the jeans that he found in the second dumpster. Matthews testified that all of the items of clothing appeared to have blood on them. He stated that it was possible for the blood on one item of clothing to be transferred to another.

Charles Blackwood, Jr., testified that he is a member of the Forensics and Firearms Unit within the Identification Unit of the Metropolitan Police Department. He stated that he examined a "Scout Felling Ax" in connection with this case. Blackwood reported that he was unable to lift any prints off of the ax, but he did determine that there was blood on the ax. Blackwood also examined a comforter that appeared to have blood on it.

Blackwood testified that he processed the Nissan Sentra in which the victim was found. He stated that some sort of liquid had been poured on the vehicle which had run off and had been wiped

off. Blackwood testified that he lifted several latent fingerprints from the Sentra. He stated that he turned the fingerprints over to Loretta Marsh for testing.

Blackwood testified that when the Sentra was brought into the lab for testing, the trunk was locked, and he was told that there was probably a body inside. He stated that he carefully processed the vehicle. Blackwood determined that there were no usable fingerprints on the outside trunk area of the car. He opened the trunk, took photographs of the body, and processed the inside of the trunk for fingerprints. Blackwood testified that part of the rearview mirror, along with an air freshener that usually hangs from rearview mirrors, were on the driver's side floorboard.

According to Blackwood, the clothes that the victim was wearing appeared to have been bleached in spots. He noted that there was a pattern of spots on the victim's clothing. He stated that most of the bleaching was on the front of the victim's clothing. Blackwood testified that one of the victim's pants pockets was turned inside out. He stated that the victim was not wearing a watch or any type of jewelry. Blackwood reported that the victim was not wearing shoes or socks, and his feet appeared to be clean. He stated that the victim had an injury to his right index finger.

On cross-examination, Blackwood acknowledged that he processed the ax in this case. He stated that the ax had a sharp side and a blunt side. Blackwood observed what appeared to be blood on the outside front area of the Sentra. He determined that some substance had been poured over the back of the trunk of the vehicle which could be consistent with someone trying to wipe the car down. Blackwood testified that he did not see a watch, jewelry, a beeper, shoes, or car keys on the victim or in the trunk. He stated that he did not see any tags on the back of the car. He noted that it was possible that socks were in the car.

Lorita Marsh testified that she works in the Identification Unit of the Metropolitan Police Department as a Police Identification Analyst. She stated that she determines the classification and identification of latent fingerprints. Marsh testified that when fingerprints are lifted from a crime scene or an imprint card, she identifies the print with a person. She reported that in May 1998, she examined a number of fingerprints recovered in this case. Marsh testified that a fingerprint which was lifted from the outer front door glass of the Sentra belonged to Jerry Wayne Barnes. She stated that she matched another print to Barnes that was lifted from the outside driver's door window. Marsh then analyzed a fingerprint taken from a beer can that was found in room 143 of the Motel 6. She stated that the fingerprint also belonged to Barnes. On cross-examination, Marsh testified that according to the fingerprint cards, Officers Blackwood and Stone lifted the prints that she analyzed.

Detective Tim Mason of the Metropolitan Police Department testified that he is a member of the murder squad which is part of the Homicide Division in the Criminal Investigation Division. He stated that he became involved in the present case on Sunday, May 24, 1998. Mason testified that he received a call for assistance at the Super 8 Motel on Harding Place. He recalled that when he arrived, Detective Johnny Lawrence and several patrol officers were already present. Mason testified that he was part of a team that arrested the two suspects in this case.

Mason stated that when he arrived, Detective Lawrence asked him to secure Room 349. He reported that he and several patrol officers located room 349 upstairs, but just as they were about to enter the room, "the door came open and the people [they] were looking for just walked out into the hall." Mason testified that he spoke with both the Defendant and Jerry Barnes at the scene. He recalled that he first spoke to the Defendant, who denied any knowledge of the crimes in this case. However, he stated that Barnes immediately told him that he knew why the police were there and that he would take them to find the body of the victim. Mason testified that Barnes led police to a wooded area off of Almaville Road in Rutherford County. He stated that at that location, police found a vehicle which appeared to have blood coming out of the trunk area. According to Mason, the Defendant was five feet, eleven inches tall and weighed about 195 pounds, and Barnes was five feet, eleven inches tall and weighed about 220 pounds. He recalled that Barnes had an injury to his thumb that appeared to be a human bite mark.

Mason testified that the Defendant waived his Miranda rights and gave a statement. He reported that the Defendant did not appear to be under the influence of any intoxicants at the time of his statement. Mason testified that the Defendant had completed the tenth grade in school. He stated that he videotaped the Defendant's statement, and the statement was introduced into evidence.

On cross-examination, Mason testified that the Defendant acknowledged being in room 143 of the Motel 6. He stated that the Defendant said that the victim was bringing him and Barnes some "rock cocaine." According to Mason, the Defendant stated that Barnes and the victim got into a fight, and the Defendant became involved in the fight only when Barnes asked for help. Mason reported that the Defendant told him that he initially hit the victim with a telephone, then went outside to the truck, got an ax, and hit the victim with the blunt side of the ax.

Mason acknowledged that the Defendant told him about the dumpsters where the clothes could be found. He also acknowledged that the Defendant told him where the ax was located. According to Mason, the Defendant stated that the manager of the Motel 6 came to the door after the fight and that Barnes became worried. He stated that the Defendant told him that after the incident, he and Barnes went to Wal-Mart to get Barnes a shirt and a pair of pants. Mason testified that Barnes is the Defendant's uncle. He stated that although the Defendant denied it at first, he later admitted to helping choke the victim by putting his hands over Barnes's hands and pressing down. According to Mason, the Defendant stated that he threw the tag to the victim's car out of the car window. He could not recall asking the Defendant about any missing jewelry or a wallet.

The Defendant's videotaped statement was played for the jury. In the statement, the Defendant told Detective Mason that Jerry Barnes was supposed to receive crack cocaine from the victim. He stated that the victim attempted to rob Barnes, and a fight ensued. According to the Defendant, the victim began biting Barnes's thumb, and Barnes then asked the Defendant to help him. The Defendant testified that he hit the victim with a telephone and then went out to Barnes's truck to get an ax. He stated that he hit the victim in the back of the head with the blunt end of the ax. The Defendant testified that Barnes began to choke the victim and that he placed his hands over Barnes's hands to help him choke the victim. He recalled the hotel manager coming to the door and

stated that Barnes was not wearing a shirt at the time. The Defendant told Mason that he later went to Wal-Mart to purchase a pair of sweat pants and a shirt.

According to the Defendant, after the crime, he drove Barnes's truck and Barnes drove the victim's car. He reported that he followed Barnes to Rutherford County and then drove Barnes back home. The Defendant stated that he threw the victim's license plate out of the window, but he did not remember the location. He told Mason the location of the ax, clothing, and bedding.

The taped deposition of Dr. William Hughes was played for the court wherein Dr. Hughes testified regarding injuries to Jerry Barnes' thumb. Hughes was unable to testify at trial due to commitments at Metropolitan General Hospital and the medical school. Barnes's medical records were also introduced into evidence.

Dr. Hughes testified that on Sunday, May 24, 1998, he was working in the emergency room at Meharry Hospital. He reported that Jerry Barnes was brought to the hospital by police. Dr. Hughes testified that according to the medical records, Barnes's chief complaint was that he had been bitten on the left thumb on the prior Friday. He testified that the diagnosis of Barnes's injury was consistent with Barnes's story that he had been bitten by a person two days prior. Dr. Hughes noted that Barnes's thumb was swollen and bruised under the nail. He also noted that Barnes had teeth marks on his thumb and a decreased range of motion. Dr. Hughes testified that Barnes's wound had become infected, which he stated would have caused a great deal of pain. He acknowledged that it was possible that the nail prevented the teeth from biting all the way through the thumb.

Dr. Hughes acknowledged that he did not specifically remember Barnes or his injuries. He stated that he testified according to what he had written in the medical chart. He explained that he took notes for diagnosis and for documentation. Dr. Hughes testified that Barnes did not have any fractures or broken bones and that all of his nerves and blood vessels were intact. He did not record any other complaints by Barnes. Dr. Hughes testified that the injury would not have caused a profuse amount of bleeding.

Dr. Bruce Philip Levy, Chief Medical Examiner for the State of Tennessee and County Medical Examiner for Nashville, Davidson County, testified that he is qualified in the courts of Tennessee as an expert in the field of forensic pathology. He stated that he performed an autopsy on the victim in this case on May 25, 1998. Dr. Levy testified that the victim was a twenty-one-year-old black male. Dr. Levy noted that the victim was five feet, nine inches tall and weighed 142 pounds at the time of death. He stated that the victim was pronounced dead on May 24, 1998 at 1:30 p.m.

Dr. Levy determined that the victim was manually strangulated and explained that he came to that conclusion based on hemorrhages in the muscles inside of the victim's neck on both sides at multiple different levels and based on the presence of petechial hemorrhages, which he explained are extremely fine pinpoint hemorrhages into the conjunctiva of the eye. Dr. Levy also made a

second diagnosis of "blunt impact injuries of the head." He stated that there were various injuries about the victim's head, including lacerations, abrasions, and contusions. Dr. Levy testified that he also diagnosed blunt impact injuries to the victim's torso and extremities. He stated that the victim had sustained bruises, scrapes, and lacerations.

Dr. Levy testified that by the time he examined the body, he noted putrefacted decomposition. He explained that this indicated that the victim had been deceased for a period of time long enough for the body to begin to undergo some post-mortem changes. He stated that the victim also had pulmonary vascular congestion, which is the "backing up of blood into the lungs." He explained that pulmonary vascular congestion is very common. Finally, Dr. Levy testified that the victim had aortic atherosclerosis, which is a small amount of fatty deposits in the major arteries of the body. He used autopsy photographs to assist in his description of the victim's injuries to the jury. The photographs were admitted into evidence.

Dr. Levy testified that the victim was fully clothed when he was brought in for the autopsy. He stated that the victim was wearing a gray shirt, a pair of blue denim shorts, and two pairs of green undershorts. Dr. Levy noted that there were no holes or defects in the clothing.

Dr. Levy stated that on the victim's right hand was "a three-quarter inch long laceration or a tearing of the skin" and that there was a hemorrhage, abrasion, or a scrape on the back of his left thumb. He testified that the laceration on the victim's right hand appeared to be a defensive wound. He opined that the victim attempted to defend himself while he was being attacked. Dr. Levy testified that the victim had abrasions on the fronts of both of his knees and that there were two lacerations on the back of his head. Dr. Levy testified that there were no external injuries to the victim's neck, which he stated was not unusual in strangulation if the pressure on the neck was applied until death.

Dr. Levy testified that there were a series of superficial injuries on the inside of the victim's lower lip. Dr. Levy reported that such injuries are typically caused by the lips being pressed against the teeth beneath them in the mouth. He stated that such injuries may be caused by the person being struck in the mouth or falling on an object or on the floor. Dr. Levy maintained that the injuries were not caused by a thumbnail or a fingernail. Dr. Levy noted that the victim had a laceration on his forehead and bruising around the left eye and left cheek area.

Dr. Levy reported that marijuana and cocaine metabolites were found in the victim's urine. He also stated that there was a small amount of alcohol in his blood and in the fluid in his eyes. Dr. Levy further noted the presence of cocaine in the victim's blood. He testified that the existence of cocaine metabolites and cocaine indicated that the victim had previously used cocaine and was also under the influence of cocaine at the time of his death.

Dr. Levy testified that the cause of death to the victim in this case was manual strangulation. He stated that strangulation causes a lack of oxygen to the brain, which causes irreversible brain damage and death. He testified that the methods of strangulation are obstruction of the veins

transporting blood from the head to the body, obstruction of the arteries blocking the flow of blood from the body to the head, and the actual obstruction of the airway itself. Dr. Levy explained that obstruction of the actual airway is extremely rare because it takes a relatively great amount of pressure to collapse an airway. He stated that in this case, it appeared as though the primary mechanism of strangulation was occlusion of the arteries themselves. Dr. Levy testified that in a case involving an occlusion of the arteries, a victim would lose consciousness before the time of death. He stated that studies have indicated that it takes about four minutes of blocking blood flow to the brain to cause irreversible brain damage and death. However, he stated that a person would begin to lose consciousness after thirty to sixty seconds.

On cross-examination, Dr. Levy testified that he observed signs of a struggle on the victim's body. He stated that the two lacerations on the back of the victim's head were consistent with someone striking the victim twice in the back of the head with a blunt object. Dr. Levy noted that the victim was probably hit three times on the face: once on the forehead, once around the left eye, and once around the left cheek. He testified that the victim's skull was not fractured and that the victim's brain was not injured. Dr. Levy acknowledged that most any solid tangible object could have caused the lacerations on the victim's head. He noted that the victim was likely strangled after the blows to the face because the body had a chance to react, and the swelling had an opportunity to occur. Dr. Levy testified that there were no injuries to the right side of the victim's face.

Dr. Levy acknowledged that the victim's blood was not tested for marijuana. He stated that cocaine enhances behavioral effects upon the body and that it excites the central nervous system, increases blood pressure, and increases heart rate. He acknowledged that the effects of cocaine could cause more blood loss. Dr. Levy testified that there would have been a surge of adrenaline in the victim if he had been in a fight. He reported that the surge of adrenalin, cocaine, and being out of breath from a fight could have decreased the amount of time for irreversible brain damage and death. Dr. Levy noted that there was a possibility that the victim had a seizure while being strangled.

Lisa Barnes, the Defendant's aunt and Jerry Barnes's wife, testified that her brother is the Defendant's father. She stated that the Defendant was twenty years old at the time of trial. Lisa Barnes testified that she had been married to her husband for thirteen and a half years and that she had known him for sixteen years. She acknowledged that the Defendant had known Jerry Barnes for the majority of his life. Lisa Barnes stated that her husband was in jail at the time of trial.

Lisa Barnes testified that at the time of the offense in this case, she was working for CNA Insurance Company, and her husband was working for Tennessee Valley Exterminating. She stated that her husband drove a company truck and had a company credit card. Lisa Barnes testified that she managed the budget in their family. She stated that her husband would generally cash his paycheck and give her the money. She testified that her paycheck was directly deposited into her account. Lisa Barnes reported that she and her husband had $5000 in one of their savings accounts and $16,000 or $17,000 in the other savings account. She stated the second account was from her father's life insurance. She testified that at the time of the offenses in this case, she and her husband had around $1400 in their checking account.

Lisa Barnes testified that she and her husband lived at 212 Old Tusculum Road. She acknowledged that her husband had a drug problem which caused problems in their marriage. She testified that when her husband was under the influence of drugs, he "would sweat profusely, be very paranoid, shift around a lot, [and] couldn't sit still." She stated that on the evening of May 22, 1998, her husband came home around 2:00 or 2:30 a.m. Lisa Barnes testified that her husband was in "a little white car" which he parked on the street in front of their driveway.

Lisa Barnes testified that after her husband arrived home, she followed him to the Apollo Apartments to drop off a car. She recalled that the following morning, she and her husband went to the store to get laundry detergent, and he put water in her car radiator. She stated that she and her husband stopped by the Defendant's apartment that morning, picked up the Defendant, and then went back to her house, where she and her ten-year-old son were dropped off. She testified that she did not see her husband again until Sunday morning. She stated that she rode with her husband and the Defendant to the bank, where she withdrew $300 and gave it to her husband. According to Lisa Barnes, her husband needed money and did not have his bank card.

Lisa Barnes testified that after her husband left on Saturday, Detective Johnny Lawrence came to her house. She stated that after Lawrence asked her what her husband was wearing the previous day, she gave Lawrence certain items of clothing out of her washing machine, including a pair of sweat pants and a shirt. Lisa Barnes acknowledged that she told her husband that the police were looking for him. She stated that she had spent the night with a friend, and her husband came to her friend's house.

On cross-examination, Lisa Barnes stated that her name was listed on her checking and savings accounts, but her husband's name is not listed. She testified that she was the only person who wrote checks from the checking account and that she had the only bank card for that account. She stated that she and her husband had filed for bankruptcy about four months prior to her father's death. Lisa Barnes testified that she would not let her husband come home if he was under the influence of drugs and that she would not give her husband money if she thought he was going to use it to buy drugs. She reported that her husband had pawned some of their personal items in the past so that he could buy drugs.

Lisa Barnes testified that when her husband came home on the weekend of the murder, he had been on a "cocaine binge" for three or four days. She stated that she knew her husband had been home while she was not there because he had changed his clothes. She stated that she saw her husband Friday afternoon around lunchtime and did not see him again until 2:00 or 2:30 a.m. the next morning. Lisa Barnes testified that her husband was "drugged out" when he came home early Saturday morning and that he was in a different car which she had seen before. She stated that she did not see any blood on the car. She recalled that she got dressed and followed her husband in her blue Corsica to the Apollo Apartments. Lisa Barnes reported that she watched her husband park the white Nissan and leave it at the apartments. She stated that she drove her husband home and then he took her car and left.

Lisa Barnes testified that after they dropped off the car, she and her husband went home. She stated that he came in for a few minutes, but he was "paranoid and he was looking out the windows and he was sweating profusely because he was strung out on crack cocaine." She testified that when she woke up, her husband was still home. Lisa Barnes stated, "I heard the door open and I looked out the window and [the Defendant] was driving down the street in his car and Jerry left and got in the car with [the Defendant.]" She testified that her husband got in the car with the Defendant around 3:15 a.m. She recalled that the Defendant was driving an Impala that belonged to her brother. Lisa Barnes testified that about ten or fifteen minutes after her husband left with the Defendant, her husband returned in his green company truck.

Lisa Barnes reported that after her husband returned in the green truck, he came inside and "was walking around the house, looking out the windows." She testified that the following morning around 8:00 a.m., her husband drove her and her nine-year-old son in the blue Corsica to get laundry detergent. Lisa Barnes acknowledged that she had bleach in her home and that she also had chlorine because they had a pool. She stated that on their way home, her husband picked up the Defendant. She testified that her husband and the Defendant dropped her and her son off at home and then left at approximately 9:00 or 9:30 a.m.

Lisa Barnes testified that she did not hear from her husband again before the police arrived at her home on Sunday morning. She acknowledged that she did not tell the police about the events of the previous night. She testified that her friend later called the police. Lisa Barnes testified that her husband did not change clothes when he came home around 2:00 or 2:30 a.m., but he did change clothes before they went to the store to get laundry detergent.

On re-direct examination, Lisa Barnes testified that she would not give her husband money if he was under the influence of drugs. She acknowledged that even when her husband was under the influence of drugs, he would still go to work. She reported that she had seen the white Nissan at her house "on multiple occasions." Lisa Barnes testified that she and her husband had gotten into arguments in the past over the white car being at her house. She stated that earlier on Friday, she picked up her husband and the Defendant at the corner of Nolensville Road and Brewer. She recalled that her husband was under the influence of alcohol and the Defendant did not have his driver's license with him, so the police would not let them drive the car. Lisa Barnes testified that the location where she picked up her husband and the Defendant was about a block from Hillcrest United Methodist Church.

Dr. Charles Warren Harlan testified that he is a physician specializing in the areas of anatomic, clinical, and forensic pathology. He stated that with the exception of certain counties, he performs autopsies for the counties in Middle Tennessee, and he also performs autopsies on a private basis as contracted. Dr. Harlan testified that he reviewed the autopsy report and the autopsy photographs of the victim in this case. Dr. Harlan noted from the autopsy report that the victim was under the influence of cocaine at the time of his death. He stated that he was aware that the medical examiner's opinion was that the victim died of manual strangulation.

-14-

Regarding the physiological effects of cocaine on the human body, Dr. Harlan testified that cocaine acts initially as a central nervous system stimulant and eventually becomes a central nervous system depressant. He explained that cocaine acts on the chemicals which transmit the impulses from one nerve fiber to another nerve fiber and from a nerve fiber to a muscle fiber. He further explained that cocaine may be a cardiac irritant or it may actually physically damage the heart muscle fibers themselves. Dr. Harlan testified that the immediate effect of cocaine on the heart is a stimulus effect which causes it to pump harder. Dr. Harlan testified that adrenalin also has a stimulant effect on the body. He explained that adrenalin causes the heart to beat more rapidly and more strongly. He stated that any physical, mental, or emotional stress can cause the release of adrenaline into the body.

Dr. Harlan testified that oxygen deprivation varies and that oxygen deprivation can occur in everything from the individual cell up to the complete person. According to Dr. Harlan, cocaine, adrenalin, and oxygen deprivation are all factors in considering the amount of time that it takes an individual to succumb to strangulation. He testified that the lack of petechia in the eyes reflects upon the amount of time associated with the actual act of manual strangulation. Dr. Harlan testified that it takes a person somewhere between thirty seconds and a few minutes to die from manual strangulation. He stated that the amount of time required for strangulation would be affected if the individual was under the influence of cocaine, was under an adrenalin rush, and was experiencing physical exertion at the time strangulation began. Dr. Harlan opined that in this case, the length of time of strangulation was closer to thirty seconds and could possibly have been less.

Dr. Harlan testified that it is very possible that as a result of the strangulation, the victim had a cardiac arrhythmia or a heart fibrillation which ultimately caused the victim's death. He stated that blood loss or the use of cocaine could cause heart fibrillation. Dr. Harlan reported that the injuries to the victim were consistent with a struggle.

On cross-examination, Dr. Harlan acknowledged that he was not present when the autopsy was performed on the victim. He stated that he reviewed two photographs that were attached to a prior deposition given by Dr. Levy. He noted that he reviewed more photographs on the morning of the trial. Dr. Harlan admitted that his conclusions were based on the deposition of Dr. Levy in a civil matter, the written autopsy report, and two photographs. He also acknowledged that in none of the photographs was he able to see the whites of the victim's eyes or the linings around the victim's eyes. Dr. Harlan testified that he was not contesting that the victim died of manual strangulation. He acknowledged that the prosecution came to his office and that he refused to answer questions regarding his opinion in this case. On re-direct examination, he acknowledged that he was formerly the medical examiner for Davidson County, but that he reached a separation contract with the government due to "irreconcilable differences."

## II. ANALYSIS

The Defendant argues that insufficient evidence was presented at trial to convict him of first degree felony murder and of second degree murder. When an accused challenges the sufficiency of

the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

## A. Felony Murder

The Defendant argues that insufficient evidence was presented for a jury to convict him of felony murder. First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy . . . ." Tenn. Code Ann. § 39-13-202(a)(2). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a).

Specifically, the Defendant contends that the State failed to prove that the killing in this case was committed in the perpetration of a robbery. The issue concerning the felony murder in this case concerns the interpretation of the statutory phrase "in the perpetration of." Id. § 39-13-202(a)(2). For a killing to occur "in the perpetration of," id., a felony so that the felony murder rule applies, the killing must be "done in pursuance of the unlawful act, and not collateral to it." Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956). "In other words, '[t]he killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it.'" Id. (quoting Wharton on Homicide § 126 (3rd ed.)).

When determining whether a killing is "in the perpetration of," Tenn. Code Ann. § 39-13-202(a)(2), a felony, courts in Tennessee have considered such factors as time, place, and causation. Buggs, 995 S.W.2d at 106. A killing "may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." Id. However, "in order for the felony-murder doctrine to

be invoked, the actor must intend to commit the underlying felony at the time the killing occurs; there is no felony-murder where the felony occurs as an afterthought following the killing." Id. at 107.

"[I]n a felony murder case, intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." Id. "Proof that such intent to commit the underlying felony existed before, or concurrent with, the act of killing is a question of fact to be decided by the jury after consideration of all the facts and circumstances." Id. (citing Hall v. State, 490 S.W.2d 495, 496 (Tenn.1973); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)). "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. at 108.

We conclude that the evidence of robbery was sufficient to support a conviction for felony murder in this case. The victim's mother testified that when the victim left home around 9:45 p.m. on May 22, 1998, he was wearing a pair of Michael Jordan shoes and several items of jewelry, including his ring, his watch, and his diamond earring. She stated that he usually carried his wallet with his driver's license in it. Finally, she stated that she had given the victim $175 in cash around 4:00 p.m. The Defendant left his home in a 1992 Nissan Sentra that was titled in his mother's name. Thomas Ward, the victim's stepfather, testified that the victim "pretty much wore jewelry all the time."

The evidence presented at trial established that at approximately 10:30 p.m., a mere forty-five minutes after the victim left his home, there was an altercation at the Motel 6 involving the victim, the Defendant, and Jerry Barnes. Tracy Rosser, the manager of the Motel 6, testified that she returned from dinner around 10:30 p.m.. She stated that as she was taking another guest to a room, she noticed that the curtain was partially down in room 143. Rosser reported that after knocking on the door several times, Jerry Barnes came to the door and acknowledged that there had been some sort of fight in the room. The Defendant admitted in a taped statement that he helped Jerry Barnes strangle the victim in the hotel room, and that this occurred just before Rosser came to the room.

With the assistance of Jerry Barnes, the victim's body was located two days after the murder in a very remote area of Rutherford County. Charles Blackwood, an identification officer, testified that he was present when the victim's body was located, and he observed that the victim's pants pockets had been turned inside out. He further stated that no items of jewelry were recovered, and the victim was not wearing any shoes or socks. The victim's mother confirmed that the none of the victim's jewelry, his wallet, or his shoes were found on or with the victim's body.

In a case similar to this one, and cited by the Defendant as authority supporting his contention that the evidence is not sufficient to support the felony murder conviction, our Court stated the following:

> The defendant asserts that there was insufficient evidence to support a conviction for
> felony murder because there is no support for conviction of the underlying felony of

theft. Although the victim's brother testified that certain pieces of jewelry that the victim always wore and the $2200 cash he received from [a witness] were missing, there has been no evidence introduced to show that the defendant took these items or that they are or were in his possession; nor was there any testimony that the defendant had been seen with these items or the money. The sheriff testified that they had searched the defendant's home, his car and the land behind his house in an effort to locate the missing items and the murder weapon, but to no avail. There was also testimony that bridge construction behind the defendant's house has resulted in the excavation of the area where the victim supposedly hid his gold and money, and nothing has been found. For these reasons, we find that the evidence of theft is insufficient to support a conviction for felony murder.

State v. Jimmy Alexander, No. 03C01-9404-CR-00159, 1995 Tenn. Crim. App. LEXIS 661, at *27 (Tenn. Crim. App., Knoxville, Aug. 4, 1995).

Although we agree that the Alexander case is similar to this one, we note several key differences. Here, the Defendant was indicted for felony murder "during the perpetration or attempt to perpetrate robbery." (Emphasis added.) In this case, the victim's mother testified that the victim left home at 9:45 p.m., wearing various items of jewelry and an expensive pair of tennis shoes. She also testified that she had just given the victim $175 in cash. She stated that the victim always carried his wallet with him when he left the house.

There is overwhelming evidence that a mere forty-five minutes after the victim left his home wearing the jewelry, and presumably carrying a wallet with $175 in cash, the victim was involved in a violent struggle with the Defendant which resulted in the victim's death. The Defendant admitted that he and Barnes disposed of the victim's body in a remote area. One officer testified that it highly unlikely that absent help from Barnes, anyone would have found the victim's car. Thus, it was extremely unlikely that persons other than Barnes and the Defendant would have found the vehicle, opened the trunk, and stolen the victim's possessions from his corpse. When the victim's body was found, his jewelry, wallet, and shoes were missing. In addition, one of the victim's pants pockets was turned inside out. Detective Lawrence testified that a piece of some form of jewelry, specifically a "chain of some type," was found in room 143 of the Motel 6. Even absent the evidence that the victim possessed a wallet, jewelry, and cash prior to the violent struggle in the motel room, the condition of the victim's pants pockets (inside out), the piece of chain jewelry, and the missing shoes are strong circumstantial evidence of an attempted robbery. It is certainly possible that the jury inferred that the Defendant and Barnes thought the victim kept his cash or other items of value in his shoes. We conclude that the jury could have reasonably inferred that the Defendant and Barnes killed the victim and took the victim's possessions from his person by violence, and thus committed murder in the perpetration of or attempt to perpetrate a robbery.

### B. Second Degree Murder

The Defendant also argues that insufficient evidence was presented to convict him of second degree murder. Second degree murder is defined, in pertinent part, as a "knowing killing of

another." Tenn. Code Ann. § 39-13-210(a)(1). In a second degree murder case, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Second degree murder is a "result-of-conduct" offense. See State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Once a homicide has been established, it is presumed to be second degree murder, and the State has the burden of proving premeditation to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999) (citing State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998)).

Having reviewed the record, we conclude that ample evidence was presented at trial to support the Defendant's conviction for second degree murder. Tracy Rosser, the manager at the Motel 6, testified that she knocked on the door to room 143 on the evening of May 22, 1998 because the curtains were pulled off the window. She stated that Jerry Barnes came to the door and stated that he had been having rough sex and then stated that there had been a fight. Detective Johnny Lawrence testified that he investigated the crimes in this case. He noted that there was blood in room 143 and that the linens were missing. Detective Lawrence determined that Jerry Barnes was registered in room 143 Friday, May 22, 1998. He then went to Barnes's home where he obtained blood-stained clothing. He also learned from Barnes's wife that the Defendant was with Barnes. Lawrence testified that police found Barnes and the Defendant on Sunday, May 24, 1998 at a nearby Super 8 Motel. Lawrence testified that Barnes led police to a salvage lot in Rutherford County where police located the victim in the trunk of a Nissan Sentra.

Detective Tim Mason testified that he assisted Detective Lawrence in arresting Jerry Barnes and the Defendant. He stated that the Defendant provided a videotaped statement to police. Mason testified that in the statement, the Defendant said that the victim came to room 143 at the Motel 6 to sell Barnes or him and Barnes some crack cocaine. According to Mason, the Defendant testified that a fight ensued between the victim and Barnes. The Defendant told Mason that at some point, Barnes asked for help, so he started hitting the victim with a phone and later with the blunt end of an ax. Finally, the Defendant stated that he helped Barnes choke the victim. This is sufficient evidence from which the jury could conclude that the Defendant was aware that his conduct on the night of the crime was reasonably certain to cause the victim's death.

Accordingly, the judgment of the trial court is AFFIRMED.

 

 

_____
ROBERT W. WEDEMEYER, JUDGE